Filed 8/18/22  Courtney v. Daimler Trucks North Am. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| SHANISHA COURTNEY et al., | B304945 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC615223) |
| v. | |
| DAIMLER TRUCKS NORTH AMERICA LLC, | |
| Defendant and Appellant. | |

APPEAL from orders and judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Reversed in part and affirmed in part.

The Homampour Law Firm, Arash Homampour, Corey Arzoumanian, Nareen Touloumdjian; Law Offices of David H. Greenberg, David H. Greenberg, Emily A. Ruby; Esner, Chang & Boyer, Stuart B. Esner and Kevin K. Nguyen for Plaintiffs and Appellants Shanisha Courtney, Raymond Courtney and Martel Courtney.

Polsinelli, David K. Schultz; Nelson Mullins Riley & Scarborough, Philip R. Cosgrove and Ryan E. Cosgrove for Defendant and Appellant Daimler Trucks North America LLC.

_____

Shanisha, Raymond and Martel Courtney (collectively, plaintiffs) brought a wrongful death action against Daimler Trucks North America LLC (Daimler), which designed the heavy-duty tractor-trailer truck that plaintiffs' mother, Cornelia Wilson, was driving when she was killed during a single-vehicle accident and ensuing fire. Plaintiffs' lawsuit alleged strict product liability and negligent design defect claims on the theory that Wilson had no chance of surviving the accident because the truck's fuel tanks were positioned where they were prone to breach in a collision, increasing the risk of a fire. The jury found for plaintiffs and concluded that driver Wilson had not been negligent.

Daimler moved for a new trial and judgment notwithstanding the verdict (JNOV) based on insufficiency of the evidence, evidentiary and jury selection errors, and attorney misconduct. The trial court granted a partial new trial on the issue of Wilson's comparative negligence, but otherwise denied Daimler's motions.

With respect to comparative negligence, Daimler bore the burden of establishing what may have caused Wilson's truck to leave the road. Evidence was required, not hypotheses. Given the absence of evidence, no reasonable finder of fact could have concluded that Wilson was comparatively negligent. Accordingly, the trial court's order granting a partial new trial on that basis was erroneous.

With respect to JNOV, one of plaintiffs' experts, whose credentials were unimpeached, testified that Daimler's fuel tanks on the 2009 Columbia ("Columbia") were placed in an unsafe

location, in contradistinction to Daimler's evidence that its fuel tanks complied with industry standards and were designed with due care. Because substantial evidence supports the jury's verdict, we affirm the trial court's denial of JNOV.

As to the cause of the fire and explosion, Daimler claims the court improperly admitted portions of an expert's testimony that went beyond the scope of what plaintiffs had previously disclosed. However, Daimler failed to abide by the trial court's pretrial instructions regarding this evidentiary challenge, and has provided us with an insufficient record for meaningful appellate review. In any event, the trial court carefully considered Daimler's objection before allowing this testimony, which Daimler fully impeached and rebutted during trial.

As to the cause of Wilson's death, Daimler designated no expert witness to testify and presented no evidence on this point. During plaintiffs' case, the coroner testified that based upon lethal levels of carboxyhemoglobin and airway stains, Wilson died of smoke inhalation from the fire. Notwithstanding, Daimler contends the trial court erred in excluding expert testimony that would have raised doubts about the procedures used by the deputy coroner to rule out brain injury, heart failure or other possible causes of death.

In excluding this testimony, the trial court concluded that theoretical possibilities as to Wilson's cause of death, unsupported by affirmative evidence, had minimal probative value that was substantially outweighed by the danger of jury confusion and speculation.

In reviewing these and other evidentiary rulings, we are cautioned to take a circumspect approach that affords considerable latitude to trial court rulings made on the scene and in the heat of the trial. Here, the challenged trial court rulings were neither arbitrary, capricious, nor patently absurd, and resulted in no

manifest miscarriage of justice. Accordingly, a new trial on these bases is unwarranted.

While plaintiffs' attorney did commit misconduct during closing argument, our independent review of the record demonstrates that the objectionable statements were not prejudicial. The trial court was in full control of the closing arguments, quickly responded to objections, and very likely would have admonished plaintiffs' counsel on the spot had a timely objection been raised. But no contemporaneous objection was made. Instead, Daimler's experienced counsel elected to respond on his own behalf, which he did eloquently and with vigor. The trial court did not abuse its discretion in declining to admonish the jury at the conclusion of the arguments once Daimler's counsel had already and ably responded.

We disagree with Daimler's contention that this trial was "error-marred." To the contrary, the record demonstrates it was conducted by two skilled and experienced trial lawyers in front of a very knowledgeable judge, who ably managed the proceedings and carefully considered the arguments of each side before making his decisions. It is also unlikely that Daimler would have received a better outcome had it had the benefit of the disputed evidentiary rulings.

Accordingly, while we reverse the trial court's partial new trial ruling, in all other respects we affirm the orders and judgment.

## FACTS AND PROCEEDINGS BELOW

### A. *Summary of the Evidence*

It was undisputed at trial that Wilson became incapacitated before the accident, as she neither attempted to brake as her truck went off the road and drove through a small grove of trees nor steered to avoid hitting anything. No party attempted to establish the cause of Wilson's incapacitation.

4

Cesar Avalos offered the only eyewitness account of circumstances leading to the fire and explosion. While driving on the freeway on the night of the accident, Avalos noticed a significant amount of dust on the road, scanned the area for the source of the dust, and saw the silhouette of a tractor-trailer truck off the side of the freeway. He stopped on the shoulder and further observed that the truck was stopped in the middle of a brush area and had no lights on. The scene was dark, but Avalos noticed a small flicker of light under the tractor. Three to four seconds after Avalos noticed the flicker of light, the truck exploded. He described the explosion as resembling a big mushroom tall enough to easily clear the trees in the area, with the cab "engulfed" in a "really hot red, orange" fire.

The remaining details of the accident were the subject of much debate. The parties presented extensive conflicting evidence, primarily in the form of expert opinion, regarding what happened after the truck drove off the road and, more specifically, how the fire ensued.

Robert Banta, Daimler's fire causation expert, an automotive engineer who had worked for Chrysler for 40 years and testified around 150 times as a fire causation expert for truck manufacturers, testified that the damage to a fluid reservoir on Wilson's Columbia caused flammable power-steering fluid to spill onto hot engine components, causing "a hot-surface ignition of the fluids" that "went to the ground, under the truck and was observed later by [Avalos] as a small fire under the truck." Eventually, the small ground fire heated the spilled diesel fuel, which ignited, "creat[ing] a very big cab fire."

Banta testified that "there [was] no element of atomization" in the fire. According to Banta, had the diesel fuel been atomized, the larger fire would have ignited almost immediately upon impact.

Banta also testified that the evidence was inconsistent with the testimony of Joseph Romig, plaintiffs' thermodynamics expert, that compression of the left fuel tank caused fuel to atomize and explode.

Robert Caldwell, plaintiffs' accident reconstruction expert, testified that after the tractor's left front corner collided with a tree, a series of chain reactions caused the left fuel tank to compress and the right fuel tank to be breached.

Romig testified that the fire resulted from fuel emitted from the left fuel tank when it was compressed.[1] Romig explained that, as the tank was compressed, a pressurized stream of diesel fuel was emitted through a process he described as "atomization." Romig testified that other leaked fluids had landed on hot metal, causing friction or electricity that ignited the immediately flammable atomized diesel-air mixture. According to Romig, only this mechanism could explain the mushroom cloud or "fireball" that Avalos witnessed.

Romig also discussed, over Daimler's objection, "an incident in New Orleans that ha[d] a similar event of diesel fuel ejection and atomization that . . . illustrate[d] what [he] [was] describing." Romig was familiar with the incident because he had investigated it, and in this capacity had also obtained security camera footage of the incident, portions of which he played for the jury.

The video depicted a "tractor-trailer truck . . . carrying gasoline [and] diesel"[2] that "had saddle-mounted diesel tanks" colliding with a "big" "electric light sign." Romig paused the video at several points and narrated for the jury what they were seeing. He described how, after "you see the sign knock down," "you see

---

[1] The left fuel tank was not found or inspected.

[2] Although the truck transported gasoline, it was powered by diesel.

kind of a gray mist developing in the area . . . between the tractor and the trailer" which was "diesel fuel coming from the side tanks."

Romig offered his opinion that "when [the tractor-trailer in the video] knocked the electrical sign down, there were lots of high voltage wires that would be associated with the sign. And as the mist came down, an electrical ignition occurred of the flammable mist." Romig testified that "this video show[ed] the jury" that atomization occurred in Wilson's accident too. He disagreed with Banta's opinion, *ante*, that spilled diesel fuel was ignited by a "pilot flame" on the ground.

Finally, Romig rebutted Banta's opinion that spilled diesel fuel was ignited by a ground fire by demonstrating through a fuel lighting test (a video of which was played for the jury) that a small heat source such as a ground fire (or in Romig's experiment a barbeque lighter) will not ignite diesel fuel that has spilled on the ground, because liquid diesel fuel does not burn.

Romig admitted on lengthy cross-examination that the New Orleans incident differed from Wilson's accident in several respects, and that the pilot flame involved a mixture of fuels, including diesel fuel and hydraulic fluids. His direct trial testimony took 17 pages of the reporter's transcript, and cross-examination spanned 31 pages.

Greg Stephens, Daimler's accident reconstruction expert, opined that the tree struck by Wilson ripped down the left side of the tractor, pushing back the bumper structure, leaf-spring, and axle, which moved several parts of the tractor rearward into the left fuel tank and damaged the power-steering fluid reservoir.

Plaintiffs' evidence regarding the design of the truck Wilson drove, the 2009 Columbia, focused primarily on the placement of the fuel tanks toward the front of the vehicle, and possible alternative designs that, according to plaintiffs' experts, would have

7

been safer and would have made it possible for Wilson to survive the accident. Daimler's competing evidence regarding the design of the Columbia was based upon extensive precautions that had been taken to assure the safety of the design, and the fact that the design met all applicable safety guidelines and had passed all required inspections.

Anthony Moore, Daimler's corporate representative who had worked at Daimler and its predecessors for almost 40 years, testified about the design and development of the Columbia. He stated that Daimler performed safety research before design and development commenced, and participated with other large manufacturers in a published study "under contract with the government." For the fuel-tank system, Moore said Daimler incorporated many design features recommended by that research.

The resulting design of the Columbia includes two side-mounted 100-gallon fuel tanks. Moore testified no other Class-8 heavy-duty truck sold in the United States is designed with diesel fuel tanks in any of the positions that plaintiffs' experts posited would be safer (namely, between the frame rails or behind the cab). Moore admitted, however, that in tank tests performed in 1998 and 1999, the tanks repeatedly ruptured and failed, and that there were no subsequent tests showing that the tanks would not fail.

The Columbia's front structure was redesigned in 2007, two years before Wilson's truck was manufactured. Daimler's tests showed it passed federal requirements, including fuel tank crash tests. After reviewing Daimler's 35 miles per hour frontal crash test, plaintiffs' design expert, Mark Pozzi, conceded there was no leak, tear or rupture of the fuel tanks during these tests.

James Jones, another expert for plaintiffs, offered opinions on whether "there was a way [the axle on the Columbia] could've been restrained" after becoming "dislodged" so it would not move

8

rearward and impact the side-mounted fuel tanks in a collision like the one at issue. He offered a "very crude conceptual design" in which a tether would be attached to the axle and would act "like a catcher's mitt slow[ing] down a baseball." Jones also developed and testified regarding a second axle tether design that attempted to address some possible difficulties with the first proposed tether design that Moore had identified at Moore's deposition.

Michael Pozzi, plaintiffs' safety expert, testified it has been "known for over 50 years, [that] you want to not have your fuel tank at the perimeter of the vehicle," and that "having exposed fuel tanks in this type of truck [has] been known to be unsafe or dangerous for . . . [¶] . . . [¶] [d]ecades." According to Pozzi, it was "obvious" that such an alternative design—namely, locating the fuel tank behind the cab—"was accepted elsewhere in the industry."

Timothy Dutra, the coroner who performed Wilson's autopsy, testified that Wilson died from carbon monoxide intoxication based upon her carboxyhemoglobin level, which was within the lethal range, and stains in her airway consistent with smoke inhalation.

Dutra conducted only a gross autopsy on Wilson, including an "external inspection" of the skull that revealed no fractures and a visual inspection of the brain after removing the top of the skull. He found no "traumatic injuries that would have accounted for [Wilson's] death" and no evidence of brain hemorrhage, fracture or dislocation. On this basis, Dutra "exclude[d]" "any brain injury" "as a cause of death." Dutra's autopsy neither revealed why Wilson drove off the freeway nor identified any evidence that she suffered a heart attack.

Daimler designated no expert witness to testify about the cause of Wilson's death.

## B.    *Plaintiffs' Closing Argument*

Weeks before trial started, the court had granted Daimler's motion in limine to preclude plaintiffs from attempting to appeal to the jury's passion and prejudice by referring to Daimler's size, resources or wealth.  Nevertheless, during closing argument plaintiffs' counsel commented indirectly on Daimler's wealth and size.  He also repeatedly disparaged the character and motives of Daimler and its witnesses.

After closing arguments, the court chastised plaintiffs' counsel for the overall disrespectful tone of his argument, and concluded, sua sponte, that counsel had violated the motion in limine ruling regarding Daimler's wealth and size.  After a liability verdict was reached, the court admonished the jury not to consider Daimler's wealth and size as it deliberated on damages.

## C.    *Verdict*

After deliberating for approximately two and a half hours, the jury found Daimler liable to plaintiffs on both the strict liability and design defect causes of action.  After deliberating for another 40 minutes, the jury awarded plaintiffs damages totaling $12 million.  The jury voted 10 to 2 on questions regarding whether "the risks of [the] . . . Columbia truck's design outweigh the benefits" and whether Daimler was "negligent in designing" the truck.  The jury voted 9 to 3 on questions regarding whether the Columbia's design was a substantial factor in causing Wilson's death.

The verdict form also required the jury to specifically find whether Wilson had been negligent in connection with the accident.  The jury voted 10 to 2 that she had not been negligent.

## D.    *Post-Trial Motions*

Daimler filed motions for JNOV and a new trial based on purported errors in jury selection, several evidentiary rulings,

10

plaintiffs' counsel's misconduct, and the jury's finding that Wilson had not been negligent.

The court denied JNOV but partially granted a new trial, concluding that the jury's finding that Wilson had not been negligent was "contradicted by the only evidence that she failed to control the movement of her vehicle." Specifically, the court noted that "[n]o evidence was presented as to why [Wilson] failed to control her vehicle except plaintiff[s'] reconstruction expert's opinion that decedent must have been 'incapacitated' when she drove off the road. The coroner testified that he saw no evidence of physical maladies beyond the trauma of the ensuing accident." The court therefore granted a new trial limited to the issues of Wilson's negligence, whether any such negligence was a contributing cause of plaintiffs' harm, and if so, apportionment.

Daimler appealed the judgment and the order denying JNOV and only partially granting a new trial. Plaintiffs cross-appealed the order granting a partial new trial.[3]

## DISCUSSION

### I. JNOV Was Properly Denied Because Substantial Evidence Supports the Design Defect Verdict

Daimler contends the design defect verdict must fail because no evidence shows that Daimler "failed to use the amount of care in designing [the Columbia] that a reasonably careful designer or manufacturer would have used in similar circumstances." (*Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 430 (*Howard*); *Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 703 (*Miller*) [identifying "standard of care applicable" in

---

[3] Plaintiffs also filed a protective cross-appeal as to any portions of the judgment adverse to them. Daimler then likewise filed a protective cross-appeal from the judgment.

the industry as an "essential element of [plaintiffs'] [design defect] case"].) We disagree.

A trial court must grant a JNOV motion if there "is no substantial evidence in support" of the verdict. (*Sweatman v. Department of Veterans Affair* (2001) 25 Cal.4th 62, 68.) We must determine whether there is evidence that is " ' "reasonable in nature, credible, and of solid value; [constituting] 'substantial' proof of the essentials which the law requires in a particular case." ' " (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.) To do so, we first resolve all explicit conflicts in the evidence and presume all reasonable inferences in favor of the verdict. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632.) We then determine whether evidence supporting the verdict is substantial. " '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' " (*Id.* at p. 1633.)

Because techniques for designing and manufacturing vehicles are not matters within common knowledge, a plaintiff must, in a vehicle design defect case such as this one, offer the opinion of a qualified expert in order to establish what "a reasonably careful designer or manufacturer would have [done] in similar circumstances."[4] (*Howard, supra*, 203 Cal.App.4th at p. 430; accord, *Miller, supra*, 8 Cal.3d at pp. 702–703 [expert testimony

_____

[4] More precisely, the jury in this case was instructed that Daimler must have failed to exercise "the amount of care in designing the product that a reasonably careful manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm." This instruction accurately paraphrased the applicable case law.

12

required in design defect case if "[t]he average layman has neither training nor experience" to know whether a design met prevailing industry standards].)

Daimler argues that JNOV is proper because plaintiffs' experts only offered possible safer alternative designs, and they did not state that Daimler breached the standard of care prevailing in the industry by failing to employ these alternative designs. Relatedly, Daimler claims that plaintiffs' experts failed to dispute that Daimler's fuel tanks complied with all industry standards and federal crashworthiness requirements.

While it is true that the jury may consider compliance with laws and applicable industry standards in deciding whether a manufacturer has exercised due care, such compliance is not dispositive. The dispositive consideration is what a reasonably careful designer or manufacturer would have done in similar circumstances.

Plaintiffs' safety expert, Michael Pozzi, whose qualifications went unchallenged, opined on "what a reasonable manufacturer should do when looking at the hazards of its products," testifying it "has been known for over 50 years [that] you want to not have your fuel tank at the perimeter of the vehicle," and that "[h]aving exposed fuel tanks in this type of truck [has] been known to be unsafe or dangerous for . . . [¶] . . . [¶] [d]ecades."

Although Daimler identifies evidence and inferences supporting its defenses, "when 'a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503, italics omitted.) Because Pozzi's opinion constitutes substantial evidence,

13

the existence of other evidence undercutting or even inconsistent with his finding of fact is irrelevant. (*Ibid*.)

Accordingly, the trial court properly denied JNOV as to plaintiffs' negligent design defect claim.

## II.    New Trial Issues

### A.    *Comparative Negligence*

Although the jury voted 10 to 2 that Wilson had not been negligent, the trial court granted Daimler a partial new trial on the ground that Wilson's failure to control her vehicle raised a presumption of negligence, which plaintiffs failed to rebut.

Plaintiffs argue that the trial court erred in re-weighing the evidence after the jury's finding in Wilson's favor. Daimler argues it would be unduly prejudicial to limit a new trial to the issue of Wilson's comparative negligence because the trial court committed multiple errors that led to the jury's finding of Daimler's overall liability.

A new trial may be granted only on grounds specified in Code of Civil Procedure section 657, one of which is "[i]nsufficiency of the evidence to justify the verdict."[5]

We review an order granting a new trial for abuse of discretion. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) "[A]n order granting a new trial . . . upon the ground of the insufficiency of the evidence to justify the verdict . . . shall be reversed as to such ground only if there is no substantial basis in the record" supporting it. (§ 657.) In other words, such an order " 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for

---

[5] Unless otherwise indicated, all further statutory references and citations are to the Code of Civil Procedure.

the movant on [the trial court's] theory.' " (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 409 (*Lane*).)

Under the trial court's theory, the fact of Wilson's accident created an inference that she was negligent, which plaintiffs failed to rebut. But that is not the law. "[E]vidence that an accident rarely occurs when due care is used does not without more indicate that a particular occurrence is more likely than not the result of someone's negligence." (*Clark v. Gibbons* (1967) 66 Cal.2d 399, 412; see *Blackwell v. Hurst* (1996) 46 Cal.App.4th 939, 944 ["[t]he fact that a particular injury rarely occurs does not in itself justify an inference of negligence unless some other evidence indicates negligence"].)

Although it is true that a properly functioning truck does not typically go off the road absent driver negligence, the same cannot be said for a truck with an incapacitated driver. The record contains no evidence indicating that Wilson negligently operated her vehicle—for example, that she drove at an unsafe speed or was intoxicated or incapacitated due to negligence. Thus, the fact of the accident alone gave rise to no inference that she was negligent.[6]

Lacking such an inference, Daimler bore the burden of establishing Wilson's negligence with affirmative evidence. It failed to do so. Therefore, " 'no reasonable finder of fact could have found for [Daimler] on [the trial court's] theory [regarding Wilson's

---

[6] Although the doctrine of res ipsa loquitur provides that an accident may be presumed to have resulted from negligence if certain conditions are met, no findings below indicate these required conditions had been met.

15

negligence]' " (*Lane, supra,* 22 Cal.4th at p. 409), and we must reverse the court's order granting a partial new trial on this issue.[7]

## B.   *Romig's Testimony*

Daimler contends a new trial is required because the court improperly admitted portions of Romig's testimony that went beyond the scope of what had been disclosed before trial.  Plaintiffs respond that Daimler failed to comply with the court's instructions regarding challenges to disputed expert testimony during trial, that Romig's trial opinions were offered in response to those of Robert Banta, Daimler's counter-designated expert, and that Romig's disputed opinions *were* mentioned at his deposition but not explored in depth by Daimler's counsel.

### 1.   *Proceedings*

Because Romig was a designated expert, the trial court's analysis was guided by *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 917 (*Kennemur*).  During the motions in limine hearing immediately preceding trial, the court explained what each party would need to do when making a *Kennemur* objection:

"If you make an objection during questioning on those grounds, whoever is doing the questioning just stops and moves on to another area.  And when we take a break, the person who makes the objection—so if its *Kennemur*, then show, 'here is why I asked this expert on these—all their opinions that you intend on providing,' etc., and then the burden shifts to the other side to show that this person, the expert, did talk about it during the deposition."

Immediately before Romig testified, Daimler filed motion in limine No. 21 to exclude any reference to the New Orleans incident,

---

[7] Daimler argues that any new trial should be unlimited rather than partial.  Because we reverse the court's order granting a partial new trial, we need not reach this issue.

*ante*, ground fire experiments, and related videos. Daimler argued that plaintiffs failed to disclose that Romig would offer these opinions and show videos to illustrate them until one business day before Romig began his trial testimony. It further argued that the New Orleans incident was not sufficiently similar to Wilson's accident to be admissible. Although Daimler's motion included a one-page excerpt of Romig's deposition, it did not point out anywhere Romig had been "locked in" to any of his opinions. Nor did counsel do so orally on the record at the time of the hearing.[8]

After viewing the videotapes and hearing argument, the court concluded that most of the exhibits were in rebuttal to Banta's ground fire opinions, although it limited what evidence could be shown to the jury.

During cross-examination, Romig was asked whether video and photos of the New Orleans incident had been produced at his deposition. He responded, "No. In the deposition, I told you that a similar incident had occurred in New Orleans that I had investigated and that involved the physical mechanisms of atomization that—that I believe happened here." Counsel inquired, "You told me that, but you didn't show me anything, correct?", to which Romig responded, "Right. You didn't ask."

### 2. *Legal Principles*

A new trial may be granted due to "any order of the court or abuse of discretion by which either party was prevented from having a fair trial." (§ 657.)

"[A] party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony *if* the opposing party has no notice or expectation that the expert will offer the new

---

[8] Daimler has also failed to include such excerpts of Romig's deposition in the appellate transcript.

testimony." (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780.) However, an expert may expand on and interpret conclusions stated during his or her deposition. (*DePalma v. Rodriguez* (2007) 151 Cal.App.4th 159, 165.)

Pursuant to *Kennemur*, when an objection is made that the proposed testimony of a designated expert will stray beyond the scope of required pretrial disclosures, the court "may, upon such terms as may be just . . . , permit [the] . . . witness . . . to testify to an opinion or data on direct examination . . . so long as the court finds that [the party offering the evidence] has made a good faith effort to [disclose the substance of the expert's opinion], and that [the party] [¶] . . . would not in the exercise of reasonable diligence have determined to call such witness" on the allegedly undisclosed matter. (*Kennemur*, *supra*, 133 Cal.App.3d at pp. 917-918.)

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) A circumspect approach to appellate review of evidentiary orders ensures an appropriate degree of trial court latitude in the exercise of that discretion. (See *Williams v. Superior Court* (2017) 3 Cal.5th 531, 540.)[9]

"Claims of evidentiary error under California law are reviewed for prejudice applying the 'miscarriage of justice' or

_____

[9] Although we agree that timely, reciprocal disclosure of expert witness information is important so as to prevent unfair surprise at trial (dis. opn. *post*, at pp. 5-8), trial courts are far better positioned than we to assess timelines or surprise, and appellate courts should not undertake de novo review of such fact-dependent decisions.

'reasonably probable' harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . , that is embodied in article VI, section 13 of the California Constitution.  Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred." (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447.)

### 3.    *Analysis*

Although the specific evidentiary issue presented is whether Daimler was unfairly and prejudicially surprised at trial by Romig's use of the New Orleans incident and related videos, Daimler provides us no transcript from which to discern the scope of Romig's deposition testimony.  The only record on the issue is Romig's own *trial* testimony, in which he stated, without contradiction, that he testified to these matters at deposition, and did not expound on them, only because defense counsel never inquired further.  On this record we cannot meaningfully review the trial court's exercise of discretion in admitting Romig's trial testimony.  On this basis alone we must affirm the court's denial of a new trial. (*People v. Hoyt* (2020) 8 Cal.5th 892, 939 [claim of error forfeited by failure to supply adequate record]; *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 [prejudice arguments forfeited for failure to cite record evidence].)[10]

---

[10] The trial court's *Kennemur* directive did not "oversimplif[y] the law" (dis. opn. *post*, at p. 10) but, on the contrary, was a reasonable procedure for expediting the resolution of evidence issues raised during trial.  (See, e.g., *Briggs v. Brown* (2017) 3 Cal.5th 808, 852-853 [recognizing trial court's inherent authority to actively manage cases]; *Nazir v. United Airlines* (2009) 178 Cal.App.4th 243, 289-290 [trial court's flexible management powers extend to all aspects of the litigation process].)  More importantly,

But even considering the merits, Romig's unimpeached statement during cross-examination—that he informed Daimler's counsel about the New Orleans incident during his deposition—indicates Daimler's counsel *was* on notice that Romig would talk about atomization of diesel fuel as an important basis for his expert testimony, and counsel was also aware of the existence of the New Orleans explosion video.

Daimler's lack of surprise is further evidenced by counsel's thorough cross-examination of Romig, during which he exhibited substantial familiarity with the New Orleans incident by effectively highlighting distinguishing characteristics.  Daimler's counsel also cross-examined Romig extensively on his "dirt demonstration,"

---

the trial court overruled Daimler's objection not for violating its *Kennemur* directive but because it found that Romig's supplemental opinions were reasonable rebuttal to those of Banta, who had been deposed on October 22, 2019, a mere six days before the trial began.

Because section 2034.310, subdivision (b) applies only to undesignated experts, whereas Romig was designated, we join the dissent in rejecting plaintiffs' alternative argument that Romig's testimony regarding the New Orleans video merely impeached Banta's opinion.  But fine distinctions between impeachment of a foundational fact and rebuttal of an opinion do not control the permissible testimony of competing designated experts.  Moreover, *Jones, supra,* 80 Cal.App.4th 557 does not support the conclusion that Romig was "in effect" made unavailable for deposition.  (Dis. opn. *post*, at p. 7.)  Rather, the *Jones* court concluded the expert was in effect unavailable for deposition only on those opinions he expressly disavowed in deposition.  (*Jones*, at pp. 562, 564 [expert "affirmatively stated that those were the only opinions he intended to express at trial"; expert "specifically disavowed holding any other opinions than those he had expressed"].)  Here, Romig disavowed nothing.  It would therefore stretch *Jones* too far to consider Romig "unavailable" for deposition regarding his New Orleans opinion.

20

challenging the similarity of the conditions under which it was conducted to those existing at the time of the accident. The lengthy testimony of Robert Banta, Daimler's expert, who denied the occurrence of atomization and detailed the differences between the Wilson accident and the New Orleans incident, further belies surprise.[11]

Although one can debate whether the videotape should have been disclosed several days before the Friday before Romig's Monday testimony, both sides took expert depositions well beyond the timelines set forth in the Code of Civil Procedure. Further, late disclosures were also part of Daimler counsel's repertoire.

All these circumstances were before the trial court when it concluded that the New Orleans incident would be allowed into evidence. Nothing about them or the court's order suggests the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. On the contrary, the court balanced Romig's deposition testimony against his proposed trial testimony according to both the principles set forth in *Kennemur* and the court's evaluation—formed during its immersion in these proceedings—of Courtney's diligence and good faith and Daimler's level of surprise.

As our division discussed in *Easterby, supra,* 171 Cal.App.4th at page 783, "the traditional response to a witness whose testimony is considered flawed would be cross-examination, impeachment, argument, and perhaps rebuttal. Defense counsel showed themselves to be well skilled in those arts." This is exactly what happened here.

---

[11] Given these record facts, we disagree with the conclusions that Romig's testimony "could not be meaningfully vetted or contextualized" (dis. opn. *post*, at p. 17) and that Romig was permitted "to present effectively unchecked testimony on a key issue." (Dis. opn. *post*, at p. 19.)

21

Nor did the ruling, even if erroneous, result in a manifest miscarriage of justice. Trial error is prejudicial and warrants reversal only when, after an examination of the entire record the appellate court " 'is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Clifton v. Ulis* (1976) 17 Cal.3d 99, 105-106.) We cannot reach such a conclusion.

Romig's testimony did not go unchecked but was ably impeached, and the jury had plentiful evidence upon which to evaluate his credibility. Moreover, although the jury verdict was not unanimous, it completed its liability and most damages deliberations within approximately two and a half hours. The probability of a different result remains only "an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

## C. *Jones Testimony*

Plaintiff called James Jones to opine about a potential energy absorbing device, but before he could do so Daimler filed motion in limine No. 20, objecting on the ground that the design about which Jones would testify differed from what he had described in his deposition. Daimler supported the argument with Jones's report and illustrations of the two purportedly different designs, one showing the device attached to a frame rail and the other showing it attached to a leaf-spring. The trial court compared the illustrations, noted that Daimler had not complied with its *Kennemur* obligations, and overruled the objection.

Daimler argues the court should have granted a new trial because Jones's trial testimony exceeded the scope of his deposition testimony. As with witness Romig, Daimler's written motion in limine did not include any excerpt of Jones's deposition. Nor did counsel point out on the record where in Jones's deposition he had

22

been "locked in" so as to preclude any testimony regarding potential additional designs.[12]

Moreover, Daimler makes no effort on appeal to describe how Jones's testimony about an undisclosed design made any difference at trial, for example, by preventing effective cross-examination or otherwise causing prejudice. Instead, Daimler summarily points out that plaintiffs intended to gain an undue advantage. Of course, plaintiffs' intentions alone create no prejudice. A new trial on this ground is unwarranted.

### D.    *Arden's Testimony*

Daimler argues that the trial court abused its discretion in preventing expert forensic pathologist Jonathan Arden from offering testimony to rebut Dutra's opinions. Plaintiffs respond that the court properly exercised its discretion to exclude Arden's testimony to prevent jury confusion and speculation.

#### 1.    *Proceedings*

Daimler sought to call pathology expert Arden to rebut Dutra's testimony wherein he ruled out several other possible causes of Wilson's death, including heart failure and brain hemorrhage. Arden proposed to testify that other possible causes, such as a brain hemorrhage, cardiac failure, chemical event or behavioral event, could not be ruled out because the gross autopsy Dutra performed did not involve the level of detail necessary to detect other possible causes.

After considerable argument before trial began, the trial court granted plaintiffs' written motion in limine No. 20 to exclude Arden's testimony as speculative, although it held open the possibility of a different result during trial. Later, the court denied

---

[12] Daimler has also failed to include such excerpts of Jones's deposition in the appellate transcript.

Daimler's requests at trial that Dutra be permitted to testify regarding the sufficiency of a gross autopsy to determine whether Wilson suffered a heart attack or brain hemorrhage.

After three separate hearings, the trial court was persuaded that Daimler's push to admit Arden's testimony would only create speculation as to whether it was smoke asphyxiation from the fire that in fact killed Wilson. More particularly, Daimler admitted Arden's testimony would be limited to whether there were "additional steps that needed to be taken in order to rule out certain causes of death." In other words, there were "additional procedures [that could have answered] . . . the questions as to what is going on with this body and this person."

The trial court rejected such testimony as speculative and confusing: "I understand Arden could say, 'You could have done more. And if you had done more, then you might have found brain hemorrhage,' or 'you might have found anything else,' but since there is no evidence of anything else, why would we tell the jury that 'if you had done more, you may have found something else?' And 'there is no evidence—and Arden is not going to present any evidence—that anything else caused her death.' "[13]

To preclude improper jury speculation, the court limited Arden's testimony to a description of Wilson's "mildly enlarged heart," which could only be considered for "life expectancy," and it gave the jury a limiting instruction to that effect.

### 2. *Legal Principles*

All relevant evidence is admissible, absent a statutory exception. Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the

---

[13] The trial court's reasoning at the motions in limine hearing was similar.

determination of an action. (Evid. Code, § 210.) Nevertheless, relevant evidence should be excluded if the trial court, in its discretion, determines that its probative value is substantially outweighed by the probability that its admission will create a substantial danger of jury confusion. (Evid. Code, § 352.) The trial court "need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (Simons on Cal. Evidence, § 1.25, p. 34, citing *People v. Taylor* (2001) 26 Cal.4th 1155, and others.)

As noted above, we review a trial court's admission or exclusion of evidence for abuse of discretion, determining whether the decision was arbitrary, capricious, or patently absurd, resulting in a manifest miscarriage of justice. (*People v. Rodriguez, supra,* 20 Cal.4th at pp. 9-10.)

3.   *Analysis*

Although Arden's opinion was minimally probative to rebut or impeach Dutra's conclusions that certain other causes of death could be ruled out, such an opinion would have had negligible value: admitting the possibility of other causes of Wilson's death would have done nothing to affirmatively establish her actual cause of death.

In other words, standing by itself, Arden's testimony regarding the limitations of Dutra's gross autopsy would have invited the jury to speculate that a head injury, a heart ailment, or some other malady *was* possibly a cause of death, even though Daimler had designated no expert to testify about possible causes of Wilson's death, and despite the absence of trial evidence suggesting other possible causes. (See *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 ["an expert's

25

opinion that something *could* be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities"].)[14]

Given its careful monitoring of the evidence and theories of liability, we cannot say the trial court abused its wide discretion under Evidence Code section 352 in excluding Arden's proposed testimony after balancing its minimal probative value against the significant danger of jury speculation.  While it may be true that the cause of Wilson's death was a crucial part of plaintiffs' theory of liability, it was incumbent upon Daimler to tackle this causation issue head-on through direct expert testimony rather than through the oblique impeachment of the coroner's procedures.

### E.   *Attorney Misconduct*

Daimler argues that comments in plaintiffs' closing argument about Daimler and its witnesses lying and misleading the jury, as

---

[14] The recent opinion by our Division Eight colleagues discussing alternative causation evidence, *Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, does not alter the result.  There, the appellate court ruled that as a matter of law the trial judge erred by "categorically" excluding competing medical opinions regarding causation of pain that were not stated to a reasonable degree of medical certainty.  However, the court made clear "that a trial court [need not] accept every opinion offered by a defense expert, no matter how speculative.  To the contrary, an ' "expert's opinion may not be based 'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . .' " ' " (*Id.* at p. 134.)  Here, the trial court made no "categorical" exclusion but instead appropriately exercised its substantial discretion under Evidence Code sections 352 and 801, subdivision (b), to exclude speculative testimony.

well as comments that the court later found violated the court's motion in limine ruling prohibiting references to Daimler's size and financial resources, constitute misconduct that tainted the jury verdict, requiring a new trial.  We disagree.

1.    *Proceedings*

Before trial, the court ordered plaintiffs not to make references to Daimler's size or wealth.  Nevertheless, during closing argument plaintiffs' counsel argued that the civil justice system permitted the jury to "hold the biggest corporation accountable," "even if they have billions of dollar[s]."

Plaintiffs' counsel also argued that Daimler "hired experts to confuse you and to misdirect you," and "hired this Banta guy" and Stephens "to trick and confuse you."  Counsel accused Daimler of using Banta and Stephens "to cheat their way into winning. . . . [¶] . . . That's what they are trying to do:  cheat their way."

Plaintiffs' counsel directly stated that Daimler "put [an expert] on the stand to lie to you."  "Because they are not interested in the truth. . . .  They have this hired gun to come in and try to confuse you."  "We have been wasting time . . . with these yahoos on the stand making up nonsense."

Many of the inappropriate comments were uttered before the first break at 11:00 a.m., and no issue of misconduct was raised by Daimler's counsel during that 15-minute interlude.  Nor was misconduct raised immediately after plaintiffs' counsel completed his initial argument.

Instead of asking for the trial court's assistance, Daimler's counsel responded by impugning the motivations of plaintiffs' counsel and plaintiffs' witnesses, quoting Carl Sandberg in the

27

process.[15]  Daimler's counsel first raised the issue of misconduct at the lunch break, after he had completed most of his own argument, stating he chose to "preserve that for the record and request an admonition."

Following the lunch break, Daimler's counsel once more went after plaintiffs' counsel's motivations and accused him of making snide comments and gratuitously disparaging witnesses.  For example, Daimler's counsel jibed that plaintiffs' counsel was practicing "deception."  (The court overruled *plaintiffs'* counsel's objection that the statement was improper.)  Daimler's counsel responded to the "Yahoo" comment by going after the credibility of one of plaintiffs' witnesses, and in concluding his closing, again pointed out the inappropriate bombast, argumentative style and the name-calling of plaintiffs' counsel.

Daimler again did not raise the issue of misconduct or an admonition during the break between Daimler's closing and plaintiffs' rebuttal.  And Daimler again made no objection when plaintiffs' counsel began his rebuttal argument with continued comments with respect to "lying and misleading."  Although Daimler's counsel objected twice during the rebuttal (requesting an admonition regarding a jury instruction, which was overruled, and an argument beyond the scope, which was sustained) he remained silent with respect to attorney misconduct.

After the completion of arguments, when the trial judge indicated he did not appreciate the unprofessional remarks by plaintiffs' counsel, Daimler's counsel requested an admonition *on another topic*.  Eventually, when Daimler's counsel belatedly requested an admonition for misconduct, the trial judge indicated

---

[15] "If the facts are against you, argue the law.  If the law is against you, argue the facts.  If the law and the facts are against you, pound the table and yell like [ . . . ]."

28

that, if an objection had been made earlier, he almost definitely would have stepped in.

Following closing argument, the trial court sua sponte brought up plaintiff counsel's violation of the in limine order with respect to Daimler's corporate wealth. The trial judge concluded that plaintiffs' counsel had violated the ruling, and chose to re-instruct the jury on that issue after it had rendered a liability verdict but before a full damages verdict was returned.

2. *Legal Principles*

Misconduct of counsel constitutes an irregularity that may support a new trial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870.)

"Personal attacks on the character or motives of the adverse party, his counsel or his witnesses are misconduct." (*Stone v. Foster* (1980) 106 Cal.App.3d 334, 355.) That must not be done "even by insinuation" (*Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 566 (*Martinez*)) because it "only serves to inflame the passion and prejudice of the jury, distracting them from . . . render[ing] a verdict based solely on the evidence admitted at trial" (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1246).

Strong attacks on the strength (or lack thereof) of an opponent's case, however, are permissible. (*United States v. Nunez* (7th Cir. 2008) 532 F.3d 645, 654.) An advocate may fairly comment on and argue any reasonable inferences from the evidence. (*People v. Samayoa* (1997) 15 Cal.4th 795, 837.) Although an advocate "may strike hard blows, he is not at liberty to strike foul ones." (*Berger v. United States* (1935) 295 U.S. 78, 88.)[16]

---

[16] Appellate courts must be careful to differentiate between ad hominem attacks of a personal nature (which are prohibited) and

A trial court's rulings on an objection to misconduct and request for an admonition are entrusted to the court's discretion. (*Martinez*, *supra*, 238 Cal.App.4th at p. 567; *Hawk v. Superior Court* (1974) 42 Cal.App.3d 108, 126.) "In ruling on a motion for new trial, a trial court has wide discretion, and we give 'great deference' to that ruling on appeal. [Citation.] However, where a motion for new trial on the ground of attorney misconduct has been denied, as is the case here, we review the entire record to make an independent determination of whether attorney misconduct was prejudicial." (*Pilliod v. Monsanto Company* (2021) 67 Cal.App.5th 591, 631.) "To demonstrate prejudice, the appellant must show a reasonable probability that a more favorable result would have been achieved in the absence of the attorney misconduct." (*Id.* at p. 635.)

3. *Analysis*

We agree that the manner in which plaintiffs' counsel disparaged the character and veracity of Daimler and its witnesses during closing arguments constituted misconduct. But we must also consider (1) the nature and seriousness of the misconduct;

---

forceful attacks on the credibility of witnesses, including party witnesses (which are permitted). After all, "a court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," including such matters as the witness's demeanor, capacity to perceive the matter about which he testifies, bias or interest, prior inconsistent statements, and attitude toward the action in which he testifies. (Evid. Code, § 780.) Cross-examination has been described as the "greatest legal engine ever invented for the discovery of truth." (*California v. Green* (1970) 399 U.S. 149, 158.) The ability to comment on a witness's perceived lack of candor, or bias, or other motivation to fabricate is a vital trial component. Nothing we say herein should be understood to undercut these points.

(2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances. (See, e.g., *Pilliod v. Monsanto Company*, *supra*, 67 Cal.App.5th at pp. 635-636.)

Here, the trial court was in full control of the closing arguments and responded to objections quickly when presented with them. Had Daimler's counsel made timely objections, the trial judge stated that he would "almost definitely" have admonished plaintiffs' counsel on the spot. However, the record supports the more plausible conclusion that Daimler's experienced counsel made a tactical decision to forego contemporaneous objections in favor of responding himself (which he did eloquently and with the assistance of a prepared written statement) and then moving for a mistrial, which he did after the arguments were almost finished. Although Daimler's counsel claimed to have misunderstood the ground rules for closing argument (i.e., that he should save objections for afterwards), he *did* object on other grounds early in the initial closing argument by plaintiffs' counsel.

Daimler's counsel also never objected to any portion of the closing argument wherein plaintiffs' counsel indirectly referenced Daimler's size or wealth. Moreover, the lack of prejudice is manifest because the reference to Daimler's size was oblique, and there was considerable evidence of Daimler's size already in the record (placed there without objection during examination of Daimler witnesses). Further, during closing argument Daimler's counsel put his client's company on a par with other very large manufacturers, including Kenworth, Packer, Mac, and International. Therefore, the jury was already plainly aware that Daimler was a very large corporation with substantial assets.

31

The prejudicial effect of the inappropriate comments was diminished by Daimler's counsel's able response without the assistance of the court, which would have stopped the misconduct immediately had objections been timely raised. Further, once Daimler's counsel responded himself to the misconduct, the trial court did not abuse its discretion in declining to admonish the jury, because doing so at that point would have been, to use the trial court's words, "putting my thumb on the scale."

We therefore conclude that a new trial on the ground of attorney misconduct was properly denied. (*Pilliod v. Monsanto Company*, *supra*, 67 Cal.App.5th at pp. 635-636 [finding lack of prejudice after full review of the record despite occasional "clearly improper" conduct by plaintiffs' counsel].)

## F.   *Jury Selection*

Daimler contends it was deprived of a fair trial because the court failed on its own motion to excuse one juror, Mr. Gonzalez, who due to his limited command of English expressed concern about his ability to understand everything that was being said. As a corollary to this contention, Daimler argues that the court improperly denied six challenges for cause as to prospective jurors whom it therefore had to excuse by using its peremptory challenges, leaving it no peremptory challenge to use as to Mr. Gonzalez.

We conclude Daimler forfeited this contention by failing to challenge Mr. Gonzalez at trial. "[A] defendant's objection to a juror's competency, first made after trial, is belated and not cognizable on appeal." (*People v. Hill* (1992) 3 Cal.4th 959, 985, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

## DISPOSITION

The judgment and order of the trial court granting a partial new trial is reversed.  In all other respects, we affirm.  Plaintiffs are awarded their costs on appeal.

NOT TO BE PUBLISHED.


CRANDALL, J.*

I concur:


CHANEY, J.

---

*Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33

ROTHSCHILD, P. J., Dissenting.

I agree that the trial court correctly denied defendant Daimler Trucks North America LLC's (Daimler) judgment notwithstanding the verdict on the negligent design defect claim, and that the court reversibly erred in ordering a new trial on the issue of comparative negligence. I also agree that counsel for plaintiffs Shanisha, Raymond, and Martel Courtney (collectively, plaintiffs) committed misconduct, but that this misconduct is not sufficiently prejudicial to alone warrant a new trial.

I disagree, however, with the majority's analysis regarding the strict liability claim. In particular, unlike the majority, I believe the court erred in not striking the testimony of plaintiffs' expert, Joseph Romig, explaining the New Orleans and ground fire videos and in admitting those videos into evidence. Further, also unlike the majority, I believe the court erred by excluding the testimony of Jonathan Arden, Daimler's pathology expert. These errors were prejudicial and warrant reversal and a new trial on plaintiffs' strict liability claim.[1]

## A. *Additional Factual Background Relevant to Expert Testimony Analysis*

Because plaintiffs' theory of liability was that Daimler had designed the fuel tanks of the 2009 Columbia in a manner that rendered Cornelia Wilson's crash and the resulting fire unsurvivable, the specific manner in which the fire ensued during the accident was crucial to plaintiffs' case. If, as plaintiffs' experts opined, a massive cab fire engulfed the tractor almost immediately upon impact with the tree, Wilson would have had

---

[1] I do not reach the issues Daimler raises regarding jury selection or certain opinions of plaintiffs' expert James Jones.

no opportunity to escape from the vehicle. If, as defense experts opined, the larger cab fire did not ignite until 1.5 to 2 minutes after impact with the tree, Wilson could theoretically have escaped the vehicle, and plaintiffs' theory of liability fails.

The crucial role these dueling timelines of the accident played at trial provides important context for my analysis of the challenged rulings regarding Romig's and Arden's expert testimony and the effects of their testimony on the outcome of the trial. Some additional detail regarding the evidence presented on these points is helpful.

Robert Caldwell, plaintiffs' accident reconstruction expert, testified the tractor's left front corner had "a major impact with a substantial tree." That impact caused the left axle and left front wheel to move back and collide with the 100-gallon fuel tank located on the left-hand side of the tractor. Based on this reconstruction, Romig, plaintiffs' thermodynamics expert, opined that the fire resulted immediately upon impact from fuel emitted from the compressed left fuel tank.[2]

Romig testified that as the tank was compressed, a pressurized stream of diesel fuel was emitted from the tank, like liquid streaming out of a crushed can of soda. Romig referred to this process of breaking down a liquid into a mist-like spray as "atomization." Small droplets of fuel evaporated, causing diesel vapor to mix with air. Although diesel fuel is not immediately flammable in liquid form below approximately 100 to 145 degrees Fahrenheit, vaporized diesel, like the diesel-air mixture Romig opined resulted from the compression of the tank, is immediately flammable when an ignition source is present.

---

[2] The left fuel tank was not found and not inspected.

Romig further opined that other leaked fluids had landed on hot metal, causing friction or electricity that ignited the immediately flammable atomized diesel-air mixture. According to Romig, only this mechanism could explain the mushroom cloud or "fireball" that Cesar Avalos witnessed. As noted in the majority opinion, Romig explained why, in his opinion, such atomization was necessary to create what Avalos saw. In this context, Romig discussed "an incident in New Orleans that ha[d] a similar event of diesel fuel ejection and atomization that . . . illustrate[d] what [he] [was] describing." The details of Romig's testimony regarding the New Orleans incident, video of the New Orleans incident, and atomization are already summarized in the majority opinion. Crucially, Romig described the video scenes while he played them for the jury. He also specifically opined that "th[e] video show[ed] the jury" atomization had occurred in this case, and that defendant's expert, Robert Banta, was incorrect in concluding otherwise.

As for the defense's proposed timeline for the accident, the majority opinion lays out most of the Banta testimony with which Daimler sought to establish that, rather than atomization causing an explosion immediately following impact, the impact initially caused only a small fire when flammable power steering fluid leaked from the fluid reservoir and spilled onto hot engine components, causing "a hot-surface ignition of the fluids" that "went to the ground, under the truck and was observed later by [Avalos]." According to Banta, this small fire under the vehicle ignited into a larger fire after several minutes.

Some additional detail about Banta's testimony is helpful. Banta testified that diesel fuel leaked from the damaged left fuel tank onto the ground, but did not immediately ignite, because

diesel fuel is not flammable in liquid form unless it is heated to approximately 120 degrees Fahrenheit.  Eventually, the small ground fire heated the spilled diesel fuel to that temperature, and the diesel fuel ignited, "creat[ing] a very big cab fire."  Banta opined this causal chain was consistent with Avalos's account of first seeing a small flicker under the cab, then the cab being engulfed by a mushroom cloud of fire.

In response to Banta's testimony, Romig testified he performed tests to demonstrate why Banta's opinion that a ground fire occurred in Wilson's accident was incorrect (the ground fire experiments).  Specifically, in an attempt to demonstrate "diesel . . . [is not] flammable when it's on the ground," Romig squirted diesel fuel onto dirt in a pan and tried to ignite it using a barbeque lighter.  The temperature of the dirt and diesel fuel were approximately 60 to 70 degrees Fahrenheit.  Romig also tried to ignite a "pool of diesel in a pan" at these same temperatures using a barbeque lighter, and was unable to ignite it.  Romig testified that the ground fire experiments demonstrated that "dirt or no dirt, pooled diesel is not going to catch on fire and create a fireball . . . [¶] . . . from a small heat source" in the manner Banta had opined occurred.  Romig played videos of the ground fire experiment during his testimony.

On appeal, Daimler challenges the admission not only of Romig's testimony about the New Orleans incident, New Orleans video, and ground fire experiments, but admission of the New Orleans and the ground fire experiment videos themselves as well.

## B. *Legal Principles Governing Expert Discovery and Disclosures*

For reasons I discuss in detail in the following sections, I disagree with the majority's conclusion that the court's evidentiary rulings regarding certain testimony of Romig and Arden and related videos do not constitute reversible error under *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 917 (*Kennemur*) and the law governing expert discovery and disclosures, of which *Kennemur* is only one part. A brief overview of the "elaborate scheme regulating discovery of the opinions of experts who will be called at trial" (*ibid.*) is helpful in assessing the trial court's interpretation of what that scheme requires.

The statutory expert disclosure scheme is built on the premise that more detailed pretrial discovery is necessary when dealing with experts, as opposed to fact witnesses, because when expert testimony is offered at trial, opposing counsel " 'must . . . cope with witnesses possessed of specialized knowledge in some scientific or technical field. They must gear up to cross-examine them effectively, and they must marshal the evidence to rebut their opinions.' " (*Bonds v. Roy* (1999) 20 Cal.4th 140, 147 (*Bonds*).) To facilitate such trial preparation, the Code of Civil Procedure requires litigants to, within a particular pretrial time frame, both identify any experts whose testimony the party may offer at trial (Code Civ. Proc., § 2034.260, subds. (a) & (b)(1)),[3] and provide a declaration for each such expert that includes, inter alia, "[a] brief narrative statement of the general substance of the testimony that the expert is expected to give" and "[a]

---

[3] Unless otherwise indicated, subsequent unspecified statutory references are to the Code of Civil Procedure.

representation that the expert will be . . . [able] to submit to a meaningful oral deposition concerning the specific testimony, including an opinion and its basis, that the expert is expected to give at trial." (§ 2034.260, subds. (c)(2) & (4).) These disclosures are intended "to give fair notice of what an expert will say at trial[,] . . . [which] allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area." (*Bonds, supra,* 20 Cal.4th at pp. 146–147; see § 2034.410 [any party to an action may depose a witness identified on an expert witness list].) Testifying experts must be made available for deposition and provide all materials made by the expert in the course of preparing the expert's opinions. (See §§ 2034.270, 2034.210, subd. (c); see also § 2034.300, subds. (c) & (d).)

" '[A]llowing new and unexpected testimony for the first time at trial' " is "contrary" to the expert discovery statute's goal of "enabl[ing] parties to properly prepare for trial." (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 566 (*Jones*), quoting *Bonds, supra,* 20 Cal.4th at p. 148.) Therefore, the trial court is required by statute to "exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to" comply with certain expert discovery and disclosure requirements designed to facilitate such preparation. (§ 2034.300, subds. (c) & (d).) For example, the statutes require a testifying expert to provide a declaration containing "[a] brief narrative statement of the general substance of the testimony that the expert is expected to give." (§ 2034.260, subd. (c)(2).) The expert is also required to provide all "writings" he has prepared in the course of reaching his opinions. (See

§ 2034.210, subd. (c).)  Failure to do either of these things results in automatic exclusion of the expert's testimony.  (See § 2034.300, subds. (b) & (c) [requiring exclusion of expert testimony for failure to provide an expert declaration or "[p]roduce reports and writings of expert witnesses [relied on in reaching the expert's opinion]"].)

Applying the spirit of these provisions, courts have also excluded expert testimony at trial " 'that exceeds the scope of [the expert's] deposition testimony if the opposing party has no notice or expectation that the expert will offer the new testimony, or if notice of the new testimony comes at a time when deposing the expert is unreasonably difficult.' [Citation.]" (*Dozier v. Shapiro* (2011) 199 Cal.App.4th 1509, 1523–1524 (*Dozier*), italics omitted; *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780 (*Easterby*) [describing this as the "clear" "overarching principle in *Kennemur*, *Jones*, and *Bonds*"]; *McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 101 [experts are "properly restricted to the opinions" disclosed in deposition]; see also *Jones, supra,* 80 Cal.App.4th at p. 565 [expert "in effect not made available for deposition as to the further opinions he offered at trial" that "during deposition he assured defense counsel he did not have" where he "promised to notify defendant if he later formulated such opinions but did not do so"].)  In *Kennemur*, for example, "[t]he decisive fact" requiring exclusion of the expert's opinion regarding tire tracks was "failure to disclose [the expert's] expected testimony concerning the tire tracks either at . . . deposition or [in a pretrial disclosure].  This failure deprived respondent of the opportunity to prepare for [the expert's] cross-examination and for possible rebuttal (surrebuttal) of his testimony." (*Kennemur, supra*, 133 Cal.App.3d at p. 918.)

Thus, under *Kennemur* and the expert disclosure statutory scheme, the guiding principle is reasonable notice—assuring counsel could reasonably anticipate expert opinions offered at trial based on the disclosures/deposition testimony provided, with the goal of affording opposing counsel sufficient opportunity to prepare for trial. (See *Bonds, supra,* 20 Cal.4th at p. 148.) "[T]he statutory scheme as a whole envisions timely disclosure of the general substance of an expert's expected testimony so that the parties may properly prepare for trial. Allowing new and unexpected testimony for the first time at trial . . . is inconsistent with this purpose." (*Ibid.*)

## C. *Romig's Opinions Regarding the New Orleans Video*

### 1. Sufficiency of the record on appeal and preservation of *Kennemur* objection[4]

The majority opinion first concludes that we cannot determine whether Romig's deposition allowed Daimler to reasonably anticipate Romig's opinions regarding the New Orleans video, because Daimler failed to include the entire deposition transcript in the record. But Romig admitted at trial that he neither provided nor discussed the New Orleans

---

[4] These issues potentially affect only the analysis of the testimony regarding the New Orleans video, not testimony regarding the ground fire experiments, because the latter is subject to exclusion on the independent basis of section 2034.300, as discussed below. Counsel did not need to comply with court directives on *Kennemur* objections in order to preserve arguments regarding exclusion of the ground fire experiment testimony under that section.

*video* at his deposition.[5]  Plaintiffs do not contend otherwise. Therefore, I do not view the lack of a full Romig deposition transcript in the record as preventing us from considering whether Romig's trial testimony *about that video* improperly exceeded the scope of what was discussed at the Romig deposition.

The majority opinion further concludes there can be no reversible error under *Kennemur* because Daimler "did not point out anywhere [in his deposition testimony] Romig had been 'locked in' to any of his opinions," something the trial court instructed the parties to do in connection with any *Kennemur* objection.  (Maj. opn. *ante*, at p. 17 & fn. 8.)  I disagree that

---

[5] Specifically, the following colloquy took place at trial, which initially focused on photographs of the New Orleans incident that Romig had referenced, but then broadened to other materials related to the incident:

"Q:  But when you were submitting for deposition in this case to provide your opinions, you didn't bring those photos [of the New Orleans incident] with you, did you?

"A:  No.  In the deposition, I told you that a similar incident had occurred in New Orleans that I had investigated and that involved the physical mechanisms of atomization that . . . I believe happened here.

"Q:  You told me that, but you didn't show me anything, correct?

"A:  Right. You didn't ask.

"Q:  Did you bring this to your deposition as part of your expert file in this case?

"A:  No."

*Kennemur* requires this, and the majority opinion offers nothing to support a contrary conclusion.

The court's directive oversimplifies the law regarding when previously undisclosed expert opinions offered at trial should be excluded. The relevant portion of the trial court's instruction is as follows: "[I]f its *Kennemur*, [the person making the objection must] then show, 'here is why I asked the expert on these—all their opinions that you intend on providing,' et cetera, and then the burden shifts to the other side to show that this person, the expert, did talk about it during the deposition." I do not read *Kennemur*, considered in the context of the cases and statutes summarized above, as requiring an expert to expressly state during deposition that he has identified all the opinions he intends to offer in order for the report and deposition to limit his testimony at trial.**6** Rather, as noted in the *Kennemur* decision itself, "[t]he decisive fact . . . is appellant's failure to disclose [the expert's] expected testimony concerning the tire tracks either at . . . deposition or as required by section 2037.3 [i.e., in a disclosure/declaration]. This failure deprived respondent of the opportunity to prepare for [the expert's] cross-examination and for possible rebuttal (surrebuttal) of his testimony." (*Kennemur, supra*, 133 Cal.App.3d at p. 918, fn. omitted.) This is consistent

_____

**6** Indeed, in *Kennemur*, because "[t]he Legislature has singled out the pretrial discovery of expert opinions for special treatment," the Court of Appeal rejected, at least in the context of testifying expert witnesses, the "proposition that the only duty imposed upon the party whose witness is being deposed is to make the witness and his reports available for examination" and/or that "the witness is under no obligation to volunteer information or to disclose relevant and material matters not requested." (*Kennemur, supra,* 133 Cal.App.3d at p. 919.)

with the larger guiding principle of the expert disclosure statutory scheme requiring only reasonable notice—that counsel must be able to reasonably anticipate the opinions based on the disclosures/deposition testimony provided, with the larger goal of affording opposing counsel sufficient opportunity to prepare trial. (See *Bonds, supra*, 20 Cal.4th at p. 148.) (See part B, *ante*.)

Of course, one way a party may have "no notice or expectation that the expert will offer the new testimony" (*Easterby, supra*, 171 Cal.App.4th at p. 780) is if the expert disavows having any further opinions beyond those noted at deposition. That did indeed occur in most of the cases applying *Kennemur*. But that is not the only way it can occur. Were it the only way, then the California Supreme Court's description of the purpose of an expert report—"giv[ing] fair notice of what an expert will say at trial[,] . . . [which] allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition" (*Bonds*, *supra*, 20 Cal.4th at pp. 146–147)—would not make sense. That is to say, if in order to determine whether an expert's trial testimony will go beyond the expert's report, counsel must elicit expert deposition testimony that his trial testimony will not, then the expert's report would not "allow[ ] the parties to assess whether to take the expert's deposition" (*ibid.*)—rather, an expert deposition would always be necessary in order to determine the scope of expert trial testimony.

Moreover, excluding expert testimony based on lack of reasonable notice without the companion requirement the majority implies—namely, that the expert has expressly affirmed he is "locked in" to a specific set of opinions—is consistent with the expert discovery statutes' approach to disclosures and

11

exclusionary sanctions generally. For example, the statutes require a testifying expert to provide a declaration containing "[a] brief narrative statement of the general substance of the testimony that the expert is expected to give." (§ 2034.260, subd. (c)(2).) The expert is also required to provide all "writings" he has prepared in the course of reaching his opinions. (See § 2034.210, subd. (c).) Exclusion of the expert's testimony *automatically* results from failure to do either of these things; the code does not require counsel to first ask at deposition whether the expert has produced every writing or disclosed every opinion in the expert's declaration. (See § 2034.300, subds. (b) & (c).) Similarly, no such requirement should be imposed in the context of expert deposition testimony.

Applying these concepts here, Daimler's *Kennemur* argument will rise or fall based on whether Daimler had reasonable notice of Romig's intent to opine on the similarity between the New Orleans video and Wilson's accident, regardless of whether or not Romig ever expressly disavowed having any opinions beyond those disclosed at his deposition. I therefore view it as inconsistent with the law for the court to have required, in order to preserve a *Kennemur* objection, that Daimler identify where Romig was "locked in" to the opinions offered at his deposition, and I do not consider Daimler's failure to comply with this ritual fatal to his *Kennemur* argument on appeal.

## 2. *The trial court abused its discretion in permitting Romig to testify regarding the New Orleans video*[7]

It is undisputed that, during his deposition, Romig mentioned the New Orleans incident and discussed the concept of atomization. The majority argues this was sufficient to put Daimler on notice that Romig would offer the opinions he did at trial. An essential element of this conclusion is the majority's characterization of Romig's challenged testimony as speaking only to the New Orleans incident and atomization. I disagree. I view Romig's trial testimony as instead going significantly beyond those topics by opining on what a specific video of the New Orleans incident—which was not provided at or prior to Romig's deposition—depicted, and on similarities between what was depicted in that video and Wilson's accident. Such opinions are not merely more specific formulations of Romig's general mention of the incident at deposition. Nor does Romig's testimony regarding the New Orleans video merely demonstrate a principle, as plaintiffs contend. (See *Culpepper v. Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 522.) Neither Banta nor any other witness has contested the general principle that atomization can occur and can lead to a mushroom cloud. Rather than using the New Orleans video to demonstrate this

---

[7] In addition, as I discuss in part E, *post*, the admission of the New Orleans video was error under Evidence Code section 352. Because the video was presented to the jury only as part of Romig's testimony, however, and because the undue prejudice that results from the admission of the video depends in large part on Romig's testimony about it, I address Romig's testimony about the video first.

13

undisputed concept, Romig used it to make very case-specific points:  that atomization in Wilson's accident created a fireball like the one depicted in the New Orleans video, and that this, not a ground fire, caused what Avalos observed.

I am also unpersuaded by plaintiffs' argument that Romig's testimony regarding the New Orleans video was merely impeaching opinions defense expert Banta offered at his deposition shortly before trial.  Plaintiffs rely on the rule that, when an expert testifies "to impeach the testimony of [another] expert witness offered by . . . [another] party at the trial," the impeaching expert need not have been previously designated, nor need the subject of the expert's impeaching testimony have been previously disclosed.  (§ 2034.310, subd. (b); see *Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1517 [section 2034.310 applied and limited designated expert's testimony on topics as to which he had not been designated an expert].)  Such impeachment testimony may not, however, " 'include testimony that contradicts the opinion' " of the expert it purports to impeach, but "may include testimony to the falsity or nonexistence of any fact used as the foundation for any opinion by any other party's expert witness." (*Collins*, *supra*, at p. 1517.) Here, Romig's testimony does not attack the *factual basis* for Banta's view that atomization did not occur during Wilson's accident.  Rather, in his challenged testimony, Romig offered his own opinions contrary to Banta's opinions.  Specifically, Romig opined (1) that atomization occurred during Wilson's crash in the manner depicted in the New Orleans video and (2) that the fireball Avalos saw was created in the same manner depicted in the New Orleans video.  These opinions thus do not constitute

14

expert impeachment testimony that is exempt from expert disclosure requirements.

Plaintiffs failed to comply with these statutory expert disclosure requirements as interpreted by case law. Romig needed to be "made available for deposition as to . . . [his] opinions" regarding the New Orleans video. (*Jones, supra*, 80 Cal.App.4th at p. 565.) "In effect," he was not, because plaintiffs informed Daimler of these opinions and provided the New Orleans video after trial had already begun and only on the Friday before Romig's Monday testimony. (*Ibid.*; see, e.g., *Dozier, supra*, 199 Cal.App.4th at p. 1524 ["counsel never informed defendants about [the expert's] postdeposition change of testimony, and therefore never gave them the opportunity to request a renewed deposition on that subject"].) This was insufficient to provide Daimler a level of notice sufficient for Daimler to "properly prepare for trial." (*Bonds, supra,* 20 Cal.4th at p. 148; see *ibid*. [identifying this as a goal of the "the statutory scheme as a whole"].)

In determining whether the court abused its discretion we must look to the applicable legal principles shaping that discretion. "[A reviewing court] cannot determine whether a trial court has acted . . . arbitrarily . . . without considering the legal principles and policies that should have guided the court's actions." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) The expert disclosure requirements plaintiffs violated here are designed to assure litigants have " 'a fair opportunity to prepare for cross-examination or rebuttal' " of expert testimony, taking into consideration the additional information and preparation necessary to cross-examine an expert. (*Easterby, supra,* 171 Cal.App.4th at p. 780*;* see *Bonds, supra,* 20 Cal.4th at p. 148.)

15

Daimler was denied such a fair opportunity here.[8] The trial court's decision to nevertheless permit it is thus inconsistent with " 'the legal principles that govern' " and, in the context of those principles, arbitrary and an abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

### 3. *Permitting Romig's testimony regarding the New Orleans video was prejudicial*

Admitting Romig's testimony was prejudicial. Trial error is prejudicial and warrants reversal when, after an examination

---

[8] I am not persuaded by plaintiffs' attempted justification that, because they did not learn of Banta's opinion denying atomization or suggesting a ground fire occurred until Banta's deposition shortly before trial, the expert disclosure scheme could not have required them to disclose what they characterize as responsive opinions any earlier than they did. The expert disclosure statutes contemplate the possibility that a party may need to expand the scope of previously submitted expert declarations to identify additional opinions and they provide procedural mechanisms for doing so. (See § 2034.620, subd. (c)(2) [addressing motions to augment expert witness lists or declarations to include "different or additional testimony" than initially disclosed].) Plaintiffs made no attempt through a motion to augment or other less formal means to alert Daimler that Romig might offer new opinions until 10 days after the Banta deposition. At that point, trial had been underway for several days, and Daimler had only a weekend to prepare to cross-examine Romig on these topics or to prepare a rebuttal. Plaintiffs offer no explanation as to why they waited so long to disclose this information. The timing of the Banta deposition thus does not excuse plaintiffs' failure to give Daimler any meaningful advance notice of Romig's testimony regarding the New Orleans video (or of his testimony about the ground fire experiments, which I discuss in part E, *post*.)

of the entire record, the appellate court " 'is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Clifton v. Ulis* (1976) 17 Cal.3d 99, 105.) A " 'reasonable probability' " does not mean more likely than not, but "merely a reasonable chance, more than an abstract possibility." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 (*College Hospital*), italics omitted.)

Permitting Romig to offer testimony about the New Orleans video at trial, despite plaintiffs having first disclosed these opinions and the video the Friday before Romig's Monday testimony, denied Daimler any meaningful opportunity to prepare to cross-examine Romig regarding the video or to gather materials and testimony to rebut his testimony. Romig's testimony involved a comparison with an entirely separate incident, information about which is not readily available without additional discovery. Plaintiffs' delayed disclosure of Romig's additional opinions denied Daimler the opportunity to discover, examine, and highlight for the jury any such salient differences between the two incidents. As a result, the jury heard expert testimony that could not be meaningfully vetted or contextualized, either through informed cross-examination or contrary expert opinion.

This is more than a theoretical problem. Romig was unable to answer several questions at trial regarding details of the New Orleans incident that might have meaningfully distinguished it from Wilson's accident, such as the respective amounts of gasoline and diesel involved, whether the truck was carrying both diesel and gasoline or just gasoline, and the extent and manner in which the fuel tank was damaged in the incident.

Of particular note are the details regarding gasoline, which experts testified is immediately flammable in liquid form at a significantly lower temperature than diesel fuel— at approximately 40 degrees Fahrenheit, compared to approximately 120 degrees Fahrenheit for diesel fuel—the size of the gas tank, specific attributes of the vehicle's design, or the speed at which the vehicle was traveling before the crash. And even if Romig had been able to answer questions about these potentially significant details, Daimler was entitled to seek or confirm such information using a source other than the testimony of the very witness Daimler was trying to impeach.

Romig's testimony about the New Orleans video also played a key role in establishing the specific mechanism and timing of the fire, which was crucial to plaintiffs' theory of liability. Namely, plaintiffs sought to prove that, as a result of the way the fuel tanks were designed, the crash caused a fire that Wilson could not have survived. If, as Romig opined, the fire was caused by atomization of diesel fuel when the fuel tank was compressed upon impact with the tree, Wilson would not have had any chance of escaping—the fire would have occurred too quickly after impact. If instead the fire was caused by diesel fuel becoming warm enough to ignite in liquid form (as Banta opined), however, Wilson would have had several minutes between impact and the fire—the time it took for the diesel to heat to a certain temperature—to exit the truck and potentially survive. Plaintiffs used the portion of Romig's testimony that was never subject to informed scrutiny to both support Romig's ultimate opinion about how the fire occurred and attack the veracity of Banta's contrary opinion. Criticizing the believability of Banta's testimony in this way also bolstered the narrative plaintiffs presented in their

18

closing argument: that Daimler's experts were lying hired guns who were trying to trick the jury. There is "a reasonable chance," and certainly "more than an abstract possibility" (*College Hospital, supra*, 8 Cal.4th at p. 715, italics omitted) that, had Romig not been permitted to present effectively unchecked testimony on a key issue, the outcome of the trial would have been different. It also undermines confidence in the verdict that Romig was permitted to unilaterally claim the incident depicted in the video was similar to Wilson's accident—while playing the video to illustrate this point—without Daimler having had a meaningful opportunity to discover any evidence regarding the particulars of that incident. (*People v. Bolin* (1998) 18 Cal.4th 297, 333 [" 'reasonable probability is a probability sufficient to undermine confidence in the outcome' "].)

Nor does it lessen the prejudice to Daimler that, as the majority notes, Daimler's counsel extensively cross-examined Romig regarding the New Orleans video and incident. (Maj. opn. *ante*, at p. 21.) Although it may be true that "the traditional response to a witness whose testimony is considered flawed would be cross-examination, impeachment, argument, and perhaps rebuttal" (*Easterby*, *supra*, 171 Cal.App.4th at p. 783), these responses are of significantly less value if, as occurred here, there is no meaningful opportunity to gather information and determine *how* the testimony may be "flawed." (*Ibid*.) Cross-examination cannot play the role the majority envisions without relevant information to inform that cross-examination. This is particularly true in the case of testimony seeking to draw comparisons; one cannot cross-examine about significant differences between the two incidents if one has no independent information regarding what those differences are.

Therefore, permitting Romig to offer opinions regarding the New Orleans video for the first time at trial was prejudicial, and the trial court reversibly erred in denying Daimler's motion for a new trial on this basis.

### D.    *Ground Fire Experiment Testimony*

Romig's testimony regarding the ground fire experiments should have been excluded under the expert disclosure statutes as well.**9**  The ground fire experiment videos constitute "writings of [the] expert" (§ 2034.300, subd. (c); see Evid. Code, § 250 [" '[w]riting' means . . . every other means of recording upon any tangible thing, any form of communication or representation, including . . . pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored"]), and were not timely disclosed as required by section 2034.270.  This triggers mandatory exclusion under section 2034.300.  (See § 2034.300, subd. (c) ["the trial court *shall* exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to do any of the following:  [¶] . . . [¶] . . . Produce reports and writings of expert witnesses under Section 2034.270"].)

Failure to exclude the testimony was prejudicial.  As discussed above, the specific mechanism through which the

---

**9** In addition, as I discuss in section E, *post*, admission of the ground fire experiment videos was error under Evidence Code section 352.  Because the video was presented to the jury only as part of Romig's testimony, however, and because the prejudice that results from the admission of the video depends in large part on Romig's testimony about it, I address his testimony about the video first.

explosion occurred was crucial to plaintiffs' theory of liability. Like the New Orleans video testimony, the ground fire experiment testimony both bolstered plaintiffs' characterization of that mechanism and undermined Daimler's characterization. Plaintiffs' failure to timely disclose this video denied Daimler the opportunity to seek discovery regarding the particulars of the experiment, to have its experts conduct experiments of their own, or to otherwise prepare to thoroughly cross-examine Romig regarding the experiment.  This is precisely what the exclusionary sanctions in section 2034.300 are designed to avoid.

### E.    *The New Orleans and Ground Fire Videos*

I also agree with Daimler that the court separately erred in permitting plaintiffs to offer the New Orleans video and ground fire video into evidence, despite plaintiffs giving Daimler no indication that they intended to play the videos until trial was underway.  These videos were disclosed as an exhibit only after trial had started, after the parties had provided their exhibit lists, and only a weekend before the videos were played for the jury.  Such delayed disclosure rendered the videos unduly prejudicial, because Daimler had no meaningful opportunity to seek discovery regarding the videos or what they depicted, nor did it have the opportunity to have its experts perform their own experiments or prepare their own videos in response.  Without Daimler presenting informed cross-examination and/or responsive evidence, the jury could not make an informed assessment of the weight and significance of the videos when they were played as part of Romig's testimony.  Moreover, playing a video for the jury—as compared to offering testimony alone—has a uniquely powerful effect, amplifying the prejudice from admitting them without assuring they are given proper

21

context.  Thus, permitting the jury to view the New Orleans and ground fire videos constitutes error and, in my view, error sufficiently prejudicial to warrant a new trial.

### F.    *Arden's Impeachment Testimony*

Finally, the majority concludes that Arden's proposed testimony regarding the limits of what Timothy Dutra's gross autopsy could show was properly excluded.  According to the majority, the probative value of this testimony "is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice"—specifically, the danger that it would encourage the jury to speculate.  (Evid. Code, § 352.)

The jury heard Dutra testify that, during his autopsy, he did not find "traumatic injuries that would have accounted for the death" of Wilson, and that, on this basis, Dutra "exclude[d]" "any brain injury" "as a cause of death."  In the Arden testimony the trial court excluded, Arden was "not going to say . . . that . . . Dutra was wrong, but that some of the things that [Dutra] said[,] [Dutra] could not tell . . . from a gross examination."  Specifically, in response to Dutra's ruling out brain injury as a cause of Wilson's death, Arden's sought to opine "there are additional steps that need to be taken in order to rule [brain injury] out" as a cause of death.  For example, Arden sought to opine that because Dutra failed to dissect the brain to determine if there was a hemorrhage, his autopsy was insufficient to exclude brain injury as Wilson's cause of death.

The majority views this testimony as minimally probative "to rebut or impeach Dutra's conclusions that certain other causes of death could be ruled out," because "admitting the possibility of other causes of Wilson's death would have done

22

nothing to affirmatively establish her actual cause of death." (Maj. opn. *ante*, at p. 25.) I disagree that the probative value of Arden's excluded testimony is minimal. Given the nature of plaintiffs' theory outlined above, the exact manner of death is crucial to establishing causation. Dutra conclusively ruling out brain injury as a cause of death is thus significant—notwithstanding that, as the majority notes, there was other evidence supporting Dutra's further conclusion that the cause of death was smoke inhalation.

As to the potential prejudice, the court concluded, and the majority agrees, that Arden's excluded testimony would have invited the jury to speculate that head injury was the cause of Wilson's death, which would have been unduly prejudicial, because Arden could not offer an opinion to a reasonable degree of medical certainty as to the cause of Wilson's death. But Arden was not trying to offer any such opinion. Rather, Arden was criticizing as unreliable and insufficient the methodology on which Dutra based his opinion ruling out brain injury. In this context, it is important to bear in mind that plaintiffs bore the burden of establishing causation. Although "testimony by a *plaintiff*'s expert who cannot opine to a reasonable medical probability is properly excluded because the opinion could not sustain a finding in the plaintiff's favor [citation] . . . [citation] [¶] . . .[,] [t]he same does not apply to a defendant's efforts to challenge or undermine the plaintiff's prima facie case. Even after the plaintiff has made its prima facie case, the general rule is that the burden to prove causation remains with the plaintiff. [Citation.] And, regardless of whether the defendant produces any evidence at all, it remains for the fact finder to say whether the plaintiff has in fact met its burden to the requisite degree

23

of certainty." (*Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 131−132.) Thus, Daimler did not need to prove an alternative causation narrative; instead, it could choose to defend itself by impugning the reliability of the causation evidence plaintiffs offered. That is what Arden's excluded testimony would have done. Specifically, Arden would have challenged the reliability of a gross autopsy as the basis for ruling out head injury as a cause of death[10] and concluding an internal hemorrhage did not occur. As a former medical examiner and expert in forensic pathology, Arden was qualified to testify regarding the proper procedures for ruling out a cause of death. Such an opinion from an expert qualified to offer it is not speculation, but rather proper impeachment, because it is not an opinion contrary to that offered by Dutra (i.e., an opinion as to the cause of Wilson's death) (§ 2034.310, subd. (b)), and instead speaks to a "matter going to the truthfulness of . . . [Dutra's] testimony." (*Kennemur, supra,* 133 Cal.App.3d at p. 922*; see *ibid.* ["Legislature intended the word [impeachment in section 2034.310, subdivision (b)] to have the meaning provided in Evidence Code section 780"] & Evid. Code, § 780, subd. (c) ["jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . [¶] . . . [¶] . . . [t]he extent of his capacity to perceive . . . any matter about which he testifies"]; see also *Kennemur, supra*, at pp. 922–923 ["[a] party may

---

    [10] Dutra did testify that his opinions were based solely on a gross autopsy, and that they were thus limited to what a gross autopsy could reveal. But Arden's expert testimony regarding the specific limitations of a gross autopsy would have assisted the jury in assessing the weight and credibility of Arden's testimony.

impeach an expert witness by [inter alia] . . . calling other witnesses to offer evidence showing the nonexistence or error in the data upon which the first expert based his opinion"].)

Thus, prompting the jury to consider whether Dutra's autopsy would have yielded the same conclusions, had he performed it differently, is not unfair prejudice, but a proper goal of the impeachment. We vet the sufficiency and reliability of the experts' methods at trial precisely because, if they are unreliable or insufficient, correcting those deficiencies could change the expert's opinion.

Arden's excluded testimony would not unduly confuse the jury. In any case, to the extent the court believed it had the potential to confuse, appropriate instructions would have remedied that possibility. Excluding this testimony was an abuse of discretion and was not harmless under the standard for evidentiary trial errors. There is a reasonable probability that the jury's nine-to-three verdict on the issue of causation would have been different, had Dutra's testimony excluding head injury as a cause of Wilson's death not gone entirely uncontradicted. This is particularly true in light of other testimony at trial that the speed at which Wilson's truck collided with the tree was sufficient for the collision to cause fatalities.[11] At a minimum,

---

[11] Specifically, Daimler's accident reconstruction expert opined that Wilson exited the freeway at a faster speed than what plaintiffs' reconstruction expert had estimated, and that the tractor actually hit the tree with 34 to 38 miles per hour of force. Factoring in the loaded vehicle's weight, Daimler's expert opined the crash involved 3.5 to 4 million pounds of energy, a level at which "you start seeing fatalities" in collisions based on governmental data. Plaintiffs' expert offered a different estimate, opining that Wilson impacted the tree at 15 to 25 miles per hour,

after hearing Arden's testimony challenging Dutra's otherwise unrebutted conclusion that Wilson did not suffer any head injury, the jury might well have determined that plaintiffs had not met their burden as to causation.

Given plaintiffs' theory at trial that the truck design prevented Wilson from surviving the accident, exactly how Wilson died was a crucial part of plaintiffs' case, and there is a reasonable probability that Arden's incorrectly excluded testimony could have affected the jury's close decision on this issue. Plaintiffs' closing argument also highlighted that Dutra had ruled out brain injury as a cause of Wilson's death, further underscoring the importance of this testimony.

For the foregoing reasons, I would reverse the judgment in plaintiffs' favor and remand the matter for a new trial on the strict liability claim.


ROTHSCHILD, P. J.

---

but offered no opinion as to whether fatalities could result from a collision at that speed.

26